IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No. 1:23-cv-00727-SKC-NRN

SECOND GREEN MOUNTAIN TOWNHOUSE CORP.
*as assignee of Marshall Bros. Constr. LLC and Robert A. Marshall,*

    Plaintiff,

v.

MESA UNDERWRITERS SPECIALTY INSURANCE CO.,

    Defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT
**(DKTS. 76 & 80)**

    This insurance-bad-faith case originates from a *Nunn* Agreement[1] between Plaintiff Second Green Mountain Townhouse Corporation (SGM) and non-parties Marshall Brothers Construction LLC and Robert Marshall (collectively, Marshall). Based on an assignment of claims it received from Marshall, SGM has sued Defendant Mesa Underwriters Specialty Insurance Company (MUSIC) for breach of

---

[1] *See Nunn v. Mid-Century Ins. Co.,* 244 P.3d 116, 119 (Colo. 2010) (holding when it appears an insurer has acted unreasonably by refusing to defend its insured or refusing a settlement offer that would avoid the possibility of excess liability for its insured, the insured may protect itself by entering an agreement to assign its bad faith claims to a third party, and in exchange the third party agrees to pursue the insurer directly for payment of the excess judgment rather than the insured).

1

contract, common law insurance bad faith, and statutory bad faith under Colo. Rev. Stat. §§ 10-3-1115, -1116.[2] Dkt. 5.

SGM moved for partial summary judgment and its motion is fully briefed. Dkts. 76, 90, 96. MUSIC moved for summary judgment on all claims and its motion is also fully briefed. Dkts. 80, 91, 95. The Court has carefully considered each motion and the related briefing and applicable legal authority. The parties have requested oral argument but none is necessary. Because the undisputed material facts establish the *Nunn* Agreement between SGM and Marshall was the result of collusion, the Court GRANTS MUSIC's motion for summary judgment and DENIES SGM's motion for partial summary judgment.

## MATERIAL FACTS

### 1. The Construction Work

Based on the parties' submissions and the Court's review of the evidence, the following facts are undisputed: SGM manages a community in Lakewood, Colorado, built in the late 1960s with 253 units in 37 residential buildings, 37 associated detached garage or carport structures, and a clubhouse. Dkt. 95-1, ¶1. Its buildings suffered hail damage in July 2016, after which it asserted a property insurance claim and contracted to replace roofs and gutters in the community. *Id.* at ¶2. After the July 2016 hailstorm, SGM contracted with Marshall to replace the roofs and gutters. *Id.*

---

[2] SGM originally filed this case in state court. MUSIC removed the case to this Court. Dkt. 1. The Court has jurisdiction under 28 U.S.C. § 1332.

at ¶3. Before Marshall started the work, however, there was a second hailstorm in May 2017 that damaged the roofs and siding on the buildings. *Id.* at ¶4. After the May 2017 hailstorm, Marshall agreed to replace the siding on the buildings. *Id.* at ¶5. Ultimately, through subcontractors, Marshall worked on roofs, gutters, and siding, completing its work in March 2018. *Id.* at ¶¶6-11.

In July 2017 townhome residents began to report to SGM that the roofs were leaking in certain areas and in some, but not all, buildings and garages or carports in the community. *Id.* at ¶12. At some point, Marshall told SGM it would begin charging for repair work, and it later gave SGM an invoice totaling $1,529,600 for work it had performed to replace siding on the buildings. *Id.* at ¶¶13-14.

**2. The Root Lawsuit**

In November 2019, SGM sued Marshall in state court asserting damage claims for defective or deficient construction work (Root Lawsuit). *Id.* at ¶15. The Root Lawsuit included claims for negligence, negligence per se, breach of implied warranties, breach of contract, breach of express warranty, and unfair and deceptive trade practices. *Id.* at ¶16. Only the cause of action for unfair and deceptive trade practices allowed for recovery of attorneys' fees. *Id.* at ¶17. But that claim was resolved by the trial court in favor of Marshall in an order of dismissal (regarding Mr. Marshall) and on summary judgment (regarding the Marshall LLC). *Id.* at ¶18.

MUSIC issued commercial general liability insurance policies to Marshall for policy periods covering 2016-2017, 2017-2018, and 2018-2019, with materially

3

identical provisions and limits. *Id.* at ¶¶19-22. All three policies had a per occurrence limit of $1,000,000 and a products/completed operations aggregate limit of $2,000,000. *Id.* at ¶23. MUSIC provided a defense to Marshall in the Root Lawsuit under a reservation of rights. *Id.* at ¶24; *see also* Dkt. 77-17 (*Nunn* Agreement), ¶5 ("MUSIC assumed the defense of DEFENDANTS against the underlying claims under what is known as a 'Reservation of Rights' to potentially deny coverage and recoup defense costs."). Marshall also used personal counsel to pursue a counterclaim against SGM for the unpaid siding work seeking $1,529,600, plus interest, in damages. *Id.* at ¶¶28-29.

### 3. Settlement Negotiations and the *Nunn* Agreement

On or about June 23, 2021, SGM disclosed to MUSIC a Preliminary Repair Proposal from Reconstruction Experts (RE Proposal). *Id.* at ¶36; Dkt. 78-8. The RE Proposal included a total repair cost of $9,670,984 and included the cost of removing and replacing all roofs on the 37 residential buildings and 37 garages/carports, and a small amount for testing siding. Dkt. 95-1, ¶36; Dkt. 78-8, ECF p.2. It also included the cost of replacing the metal roof on the carport at Building 23 even though SGM's expert did not have any criticism of that roof. Dkt. 95-1, ¶¶38-39.

Marshall also had expert witnesses in the Root Lawsuit—Western Engineering & Research Corporation (WERC) and Vertex Engineering (Vertex). *Id.* at ¶43. The expert reports prepared by WERC and Vertex did not agree with the scope of repairs claimed by SGM or the amounts to be incurred to make repairs. *Id.*; *see generally* Dkt.

77-9 (WERC report); 77-10 (Vertex report). WERC provided an opinion that a narrower scope of repairs was necessary, and, in a report dated July 7, 2021, Vertex opined that the cost of completing WERC's scope of repairs would be $78,014.47. Dkt. 95-1, ¶44; Dkt. 77-10, ECF p.8. Vertex also reviewed the scope of work in the RE Proposal and gave an opinion that that scope of work could be accomplished for $6,496,337.01 instead of $9,670,984.13. Dkt. 95-1, ¶45; Dkt. 77-10, ECF p.7. Vertex later, on September 1, 2022, reduced its estimate of the scope of work in the RE Proposal to $3,100,000. *Id.* at ¶46.

Settlement discussions eventually got underway. On October 14, 2021, SGM demanded $9,998,984.13 in exchange for mutual releases of SGM and Marshall. Dkt. 95-1, ¶47. At an initial settlement conference, MUSIC offered to settle for $78,014.47. *Id.* at ¶48. On January 31, 2022, SGM demanded $6,000,000 in exchange for a full and final release of all claims asserted in the Root Lawsuit. *Id.* at ¶49. On February 18, 2022, MUSIC made a settlement offer of $250,000. *Id.* at ¶50.

At a second settlement conference in September 2022, the parties engaged in further negotiations, at the end of which SGM demanded $4,700,000 in response to a $650,000 offer from MUSIC. *Id.* at ¶51. At that second settlement conference, on September 8, 2022, MUSIC was told that SGM's counsel asked Marshall to propose a *Nunn* agreement. Dkt. 96-1 at ¶59.

On September 13, 2022, SGM demanded $3,000,000[3] in exchange for a full and final release of all claims asserted in the Root Lawsuit. Dkt. 95-1, ¶52. The full and final release of "all claims" referenced by SGM included a demand for a release of Marshall's counterclaim. *Id.* at ¶53. On September 17, 2022, Marshall provided MUSIC with a draft *Nunn* agreement. Dkt. 96-1, ¶60. In the email sending the draft, Marshall informed MUSIC it intended to execute the proposed agreement if MUSIC did not settle the Root Lawsuit by September 21, 2022.[4] *Id.* at ¶61.

On September 20, 2022, MUSIC responded with an increased counteroffer of $750,000. Dkt. 95-1, ¶54. The next day, September 21, 2022, SGM and Marshall entered a *Nunn* Agreement and provided MUSIC with an executed copy. *Id.* at ¶55; Dkt. 96-1, ¶62; Dkt. 77-17.

Marshall signed the *Nunn* Agreement not out of concern for future liability, but rather, to avoid paying monthly attorneys' fees to the lawyer they hired to pursue Marshall's counterclaim. Dkt. 78-6, depo. pp.123:6-11, 124:2-11. In the *Nunn* Agreement, SGM and Marshall stipulated to a total confessed judgment against Marshall of $13,428,777.12, composed of the $9,670,984.13 amount from the RE Proposal, $400,598.71 in claimed litigation costs incurred by SGM's counsel, and

---

[3] The parties dispute whether this amount is within policy limits. That dispute is immaterial to this Order. For purposes of this Order, the Court assumes (without deciding) the $3,000,000 offer is within policy limits.

[4] While the parties never specify, there is suggestion in the record that the Root Lawsuit was set for trial to begin on September 26, 2022. Dkt. 77-14, ECF p.1.

6

$3,357,194.28 in attorneys' fees for SGM's counsel (calculated as 1/3 of the sum of the RE Proposal and the litigation costs). Dkt. 95-1, ¶56. The *Nunn* Agreement further provides SGM with a full release of Marshall's counterclaim, an assignment of Marshall's rights against MUSIC, and an assignment of claims against Marshall's subcontractors. *Id.* at ¶58.

Marshall did not negotiate the settlement amount in the *Nunn* Agreement. *Id.* at ¶59. Instead, "[t]he negotiation was that the association would take Mr. Marshall and his entities out of harm's way, would not -- would not -- a covenant not to execute against them. And in exchange for that consideration, the association wanted a judgment confessed in the amount set forth in the table." Dkt. 91-13, ECF p.2; *see also id.* at ECF p.3 (testifying the $400,598.71 in costs was not negotiated); Dkt. 78-10, ECF p.5; Dkt. 78-11, ECF p.5 (testifying the $3,357,194.28 in attorneys' fees was not negotiated). "[T]here was no negotiation of the number. There was just a negotiation of the agreement." Dkt. 78-11, ECF p.4. The *Nunn* Agreement itself contains the following recital regarding the settlement amount:

> Based on engineering opinions and other forensic investigations in the Lawsuit as further detailed below, [SGM] will present proof that the Property has experienced property damage of a significant and substantial nature, loss of use of property, as well as risks to life, health, and safety during the relevant insurance policy periods. *[Marshall] do[es] not dispute the existence and reasonableness of those damages.*

Dkt. 77-11, ¶7 (emphasis added).

7

The *Nunn* Agreement also contains numerous recitals that either favorably characterize Marshall's conduct or negatively characterize MUSIC's conduct in providing a defense to Marshall, specifically: [5]

> 5. . . . MUSIC was promptly notified of the claims, the Complaint and all the amendments to the Complaint, the Lawsuit, and the underlying claims for money damages by the Parties or on their behalf within a reasonable time under the circumstances. MUSIC has, in an unsatisfactory fashion, responded to the notice. MUSIC has consistently and unreasonably failed to acknowledge unconditionally, indemnity coverage under its policy; has unreasonably failed to timely withdraw reservations of rights to deny coverage; and has unreasonably failed to consummate a reasonable settlement of the Lawsuit and has otherwise breached its duties and obligations owed to the Parties. Further, MUSIC provided DEFENDANTS with defense counsel and controlled the scope and course of the defense of DEFENDANTS. Based on the tripartite relationship, there was an appearance of divided loyalties. MUSIC has failed to undertake an adequate investigation of the damages to the subject Property and has turned a blind eye to the information available to it regarding the damages at the subject Property. Nonsensically, MUSIC has taken the position that because the experts retained by MUSIC's chosen defense counsel only documented damages to the interiors of 24 of the 253 units at the Property, that DEFENDANTS are only entitled to indemnity for those units, irrespective of the documented damages at numerous other units identified by the disclosures in the Lawsuit. MUSIC's inadequate damages investigation also extended to its failure to acknowledge that the Property has suffered damages in framing, sheathing, and interstitial spaces that are not necessarily visible from interior inspections as well as its failure to acknowledge that interior damages may not have been visible at the time of the interior inspections on account of painting or other remedial steps taken by homeowners since the damage manifested.
>
> 6. During the course of MUSIC's defense of DEFENDANTS, MUSIC has taken numerous actions, which in light of its continuing refusal to withdraw its alleged reservations of rights, to fully acknowledge its

---

[5] The *Nunn* Agreement defines the parties to it as follows: SGM is "Association;" Marshall is "Defendants;" and SGM and Marshall are collectively "Parties." Dkt. 77-17, ECF p.1.

8

> indemnity obligations, and to consummate a reasonable settlement, which have created such a substantial conflict of interest to the detriment of ASSOCIATION and DEFENDANTS so as to leave DEFENDANTS with no reasonable choice but to reject the continued and proffered "defense" of ASSOCIATION'S claims and take the reasonable and necessary steps of entering into this Agreement to protect itself, its officers and directors, and members from financial and other ruin.
>
> \* \* \*
>
> 8. Numerous settlement discussions have been conducted in this matter. ASSOCIATION offered to settle with DEFENDANTS for an amount within the MUSIC policy limits, and DEFENDANTS have demanded that MUSIC settle the case for an amount which the parties believe to be within the policy limits. Despite the foregoing, MUSIC has failed and refused to contribute a sufficient amount to settle the case in light of the potential damages and DEFENDANTS' uninsured exposure to excess damages totaling nearly $10M.
>
> 9. MUSIC has failed to properly differentiate between its obligations to ASSOCIATION and its obligations to DEFENDANTS, has inappropriately tried to reserve its rights, has failed to indemnify ASSOCIATION and DEFENDANTS, and has failed to settle and indemnify and otherwise perform its obligations.

*Id.* at ¶¶5-6, 8-9. SGM and Marhsall agreed these recitals "are deemed a substantive part of this Agreement." *Id.* at ECF. p.2.

## LEGAL PRINCIPLES

### 1. Summary Judgment

The purpose of summary judgment is to assess whether a trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the "responsibility of informing the district court of the basis for its motion, and

9

identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, then the nonmoving party must identify material facts showing there is a genuine dispute for trial. *Id.* at 324. A fact is "material" if it has the potential to affect the outcome of a dispute under applicable law. *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). An issue is "genuine" if a rational trier of fact could find for the nonmoving party on the evidence presented. *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). In performing this analysis, the factual record and any reasonable inferences from it are construed in the light most favorable to the nonmoving party. *Id.*

When the Court is faced with cross motions for summary judgment, the "filing of cross motions does not mean that the material facts are undisputed even if the parties focus on the same claim or defense." *In re Ribozyme Pharm., Inc. Secs. Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002). And denying one does not automatically require granting the other. This is because "the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact[.]" *Id.* Cross motions, therefore, must be treated separately. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1147 (10th Cir. 2002) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)).

10

### 2. *Nunn* Agreements

A *Nunn* agreement is one where an insured assigns its bad faith claims to a third party in exchange for the third party's agreement to pursue the insurer directly for payment of an excess judgment rather than the insured. *Auto-Owners Ins. Co. v. Bolt Factory Lofts Owners Ass'n Inc.*, 487 P.3d 276, 282 (Colo. 2021); *Nunn v. Mid-Century Ins. Co.*, 244 P.3d 116, 119 (Colo. 2010). The Colorado Supreme Court acknowledged that "this method raises concerns where . . . the judgment results from a pretrial stipulation between the insured and third party rather than an adversarial proceeding before a neutral factfinder." *Nunn*, 244 P.3d at 119. But it determined that "the risk of collusion may be tolerable in light of the relative positions of the parties." *Id.* at 120 (internal quotations and citation omitted). Its remedy for allowing a "tolerable" risk of collusion in *Nunn* agreements was to explain that the existence of fraud or collusion could be determined at a trial, such as, by the insurer bringing an action for declaratory relief or raising fraud or collusion as an affirmative defense in the assignee's subsequent bad faith action. *Id.* at 123.

## ANALYSIS AND FINDINGS

MUSIC asserted "fraud and collusion" as an affirmative defense in its Answer and argues the same in its motion for summary judgment. Dkt. 18 (Answer), p.11 ¶4 ("The Settlement Agreement was the product of fraud and collusion and therefore the Settlement Agreement and the stipulated judgment described therein are not enforceable against MUSIC."); Dkt. 80, §B. SGM argues there is no evidence of fraud

11

or collusion. Dkt. 91, §B. The Court agrees with MUSIC and finds the undisputed material facts leave no genuine issue for trial regarding the *Nunn* Agreement being the product of collusion between SGM and Marshall. *See Cont'l Cas. Co. v. Hempel*, 4 F. App'x 703, 719 (10th Cir. 2001) ("[C]ourts have found collusion or unreasonableness as a matter of law when the evidence in the record indicated that a factfinder could reach no other conclusion.").

So far there is little guidance from the Colorado appellate courts regarding the elements of collusion as an affirmative defense to *Nunn* agreements. The United States Supreme Court, when discussing a collusive lawsuit, suggested that an intentional misrepresentation is not required for collusion to exist. *United States v. Johnson*, 319 U.S. 302, 304-05 (1943). Similarly, the District of New Mexico determined concealment also is not a requisite of a collusive agreement. *Cont'l Cas. Co. v. Westerfield*, 961 F. Supp. 1502, 1506 (D.N.M. 1997), aff'd sub nom. *Cont'l Cas. Co. v. Hempel*, 4 F. App'x 703 (10th Cir. 2001). In this context, therefore, collusion or fraud "are often defined broadly and are not necessarily tantamount to the tort of fraud in that there need not be a misrepresentation of a material fact." *Hempel*, 4 F. App'x at 717 (internal quotations and citation omitted).

Instead, "[c]ollusion may be found where the evidence demonstrates an absence of conflicting interests—the 'lack of opposition between a plaintiff and an insured that otherwise would assure that the settlement is the result of hard bargaining.'" *Westerfield*, 961 F. Supp. at 1506 (quoting *Independent Sch. Dist. No.*

*197 v. Accident and Casualty Insurance*, 525 N.W.2d 600, 607 (Minn. App. 1995). *See also Johnson*, 319 U.S. at 305 ("Such a suit is collusive because it is not in any real sense adversary. It does not assume the 'honest and actual antagonistic assertion of rights' to be adjudicated—a safeguard essential to the integrity of the judicial process.") (citation omitted).

One author has identified some hallmarks of collusion which various courts have cited:

> Any negotiated settlement involves cooperation to a degree. It becomes collusive when the purpose is to injure the interests of an absent or nonparticipating party, such as an insurer or nonsettling defendant. Among the indicators of bad faith and collusion are unreasonableness, misrepresentation, concealment, secretiveness, lack of serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer. They have in common unfairness to the insurer, which is probably the bottom line in cases in which collusion is found.

Stephen R. Schmidt, *The Bad Faith Setup*, 29 Tort & Ins. L.J. 705, 727–28 (1994).[6] Courts have found agreements similar to *Nunn* agreements to be collusive when certain of these hallmarks exist. *See, e.g.*, *Sidman v. Travelers Cas. & Sur.*, 841 F.3d 1197, 1206 (11th Cir. 2016) ("This evidence supports the inference that the settlement agreement was negotiated in bad faith, as it shows that Culbreath was willing to lie down and accept a judgment of any amount against it so long as it would not be on

---

[6] In the context of a collusive and uncontested trial, the Tenth Circuit also considered the damages incurred by plaintiff, the merits of the claims and defenses, defendant's relative fault in relation to other parties who could be held liable, and plaintiff's likelihood of success. *Hempel*, 4 F. App'x at 717.

the hook to satisfy the judgment. It demonstrates that Culbreath only acquiesced to this arrangement because it believed that it could impose on Travelers all or most of the financial burden of the settlement agreement[.]"); *Sargent v. Johnson*, 551 F.2d 221, 232 (8th Cir. 1977) ("Counsel for the insured did not enter into a bargain to settle its liability claims for a fair price, but entered into a questionable collaboration by which the parties maneuvered through terms of a settlement agreement to impose an uncompromised full balance of a judgment upon the insurer, while the insured incurred no real detriment."); *Bond Safeguard Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, No. 6:13-cv-561-ORL-37DAB, 2014 WL 5325728, at *9 (M.D. Fla. Oct. 20, 2014), aff'd, 628 F. App'x 648 (11th Cir. 2015) (agreement collusive where it provided additional benefits to the insured, insured acquiesced in the judgment amount supplied by plaintiff despite having viable defenses, and insured did nothing to minimize liability).

The collusion here is not hard to spot on the undisputed material facts before the Court. First, Marshall did not negotiate any of the dollar amounts contained in the agreement. And Marshall signed it not out of concern for potential liability—such as damages exceeding available insurance coverage—but instead to avoid paying monthly attorneys' fees to counterclaim counsel. Despite having two expert reports (the WERC and Vertex reports) that calculated lower cost estimates for the $9.6 million estimate by SGM's expert, Marshall accepted this full amount and represented in the *Nunn* Agreement that "[Marshall] do[es] not dispute the existence

14

and reasonableness of those damages." Dkt. 77-11, ¶7. Negotiation over the purported damages contained in the *Nunn* Agreement was nonexistent.

Second, without negotiation, Marshall also agreed to pay $3,357,194.28 (calculated as 1/3 of the $9,670,984.13) in attorneys' fees. The only claim in the Root Lawsuit that afforded SGM recovery of attorneys' fees was its claim for unfair and deceptive trade practices. Dkt. 95-1, ¶17. But the trial court dismissed that claim, so SGM could not have recovered fees had it prevailed at trial. *Id.* at ¶18. And yet, Marshall agreed to pay exorbitant fees anyway and without negotiation over the amount. *Bond Safeguard*, 2014 WL 5325728, at *9 (the insured may not "indiscriminately load the carrier's wagon with bricks of damage that no reasonable person would expect as consequences of the underlying claim"). SGM argues that because it retained the right to appeal the dismissal of the unfair and deceptive trade practices claim it was proper to account for fees in the *Nunn* agreement. Perhaps, but the problem is the included fee amount was not the result of hard bargaining that accounted for the risks or features associated with an appeal. It was instead a number SGM put into the agreement and Marshall didn't blink an eye. The failure to blink is also evident in the fact that Marshall further "loaded the carrier's wagon" by agreeing to liability for replacing at least one roof—the metal roof on the building 23 carport— that SGM didn't even claim to be defective. Dkt. 95-1, ¶¶38-39.

Third, just eight days before signing the *Nunn* Agreement, SGM offered to settle for $3,000,000. *Without negotiation*, Marshall then agreed to settle for payment

15

of an amount that was 347% more ($13,428,777) than what SGM offered just eight days prior. *See, e.g., Bond Safeguard*, 2014 WL 5325728, at *3, *9 (finding a *Nunn*-type agreement collusive where plaintiffs previously offered to settle with the insured for $5,000,000 and the insured later settled for payment of $40,410,729).

Fourth, Marshall appeared to have meritorious defenses, including a $1.5 million counterclaim. Marshall's defenses were supported by two different experts (WERC and Vertex) who offered opinions that disagreed with SGM's RE Proposal in terms of the scope of work and cost estimate. Dkts. 77-9, 77-10, 77-14. Marshall also asserted 38 affirmative defenses[7] in the Root Lawsuit and succeeded in obtaining dismissal of one of SGM's claims for relief. Dkt. 91-5, ECF pp.3-7. SGM points to the fact that defense counsel hired by MUSIC to defend the Root Lawsuit wrote in a pre-mediation report that he estimated a probable adverse verdict in the range of $100,000 to $10,000,000. Dkt. 95-1, p.2 ¶2. SGM argues the $10 million estimate shows Marshall's defenses were weak. The Court disagrees. For one, this estimated range is chasmic with $9.9 million separating the low and high ends, so it's not that useful. For two, one could conversely argue the $100,000 estimate on the low end suggests solid defenses considering the over $9.6 million in damages claimed by SGM. But because the range is so extensive, the more helpful consideration for the strength

---

[7] While generally defendants tend to be overinclusive when asserting affirmative defenses, it is hard to conceive that all 38 of Marshall's affirmative defenses were meritless.

16

of Marshall's defenses is the undisputed fact that Marshall had support for the defense in the WERC and Vertex reports.

And fifth, the recitals in the *Nunn* Agreement, which is one of the only aspects Marshall *did* negotiate, suggest an attempt to influence the insurance coverage and harm MUSIC's interests. Dkt. 91-13, depo. p.55:20-21 (testifying "[t]he number was not negotiated; the agreement was."). Numerous recitals either favorably characterize Marshall's conduct or negatively characterize MUSIC's conduct in providing a defense to Marshall. Dkt. 77-17, ¶¶5-6, 8-9. The Court has block-quoted these recitals above in the material facts section, but as a truncated example, the recitals go great lengths to describe MUSIC's "unreasonable failures," its "unsatisfactory" conduct, and even its "nonsensical" position. *Id.* at ¶5. The recitals accuse MUSIC of "an appearance of divided loyalties," of having "turned a blind eye," and of conducting an "inadequate damages investigation." *Id.* They go on to claim MUSIC's conduct created "a substantial conflict of interest to the detriment of ASSOCIATION and DEFENDANTS," and accuse MUSIC of having "failed to properly differentiate between its obligations to ASSOCIATION and DEFENDANTS." *Id.* at ¶¶6, 9. And yet other recitals conflate or equate MUSIC's obligations to its insured, Marshall, with its "obligations" to SGM, who sued its insured. *Id.* at ¶5 (reciting that MUSIC "has otherwise breached its duties and

17

obligations owed to *the Parties*") (emphasis added), ¶9 (reciting that MUSIC "has failed to indemnify ASSOCIATION and DEFENDANTS[.]").[8]

As the Court understands it, even when an insurer has acted in bad faith, none of these biting provisions—which SGM and Marshall negotiated and agreed were "deemed a substantive part of this Agreement" (Dkt. 77-17, ECF p.2)—are necessary to the validity or enforcement of a *Nunn* agreement. *See Auto-Owners Ins. Co.*, 487 P.3d at 282 (A *Nunn* agreement is "an agreement whereby the insured assigns its bad faith claims to the third party, and in exchange the third party agrees to pursue the insurer directly for payment of the excess judgment rather than the insured.") (quoting *Nunn*, 244 P.3d at 119). Their negotiated inclusion in this agreement suggests a level of collaboration between SGM and Marshall further compelling of collusion.

SGM argues that most of MUSIC's collusion arguments center on the reasonableness of the settlement amount and that this issue is properly reserved for the jury. But this argument merely avoids MUSIC's clear arguments referencing evidence and facts bearing on the issue of collusion. Further, even if the parties dispute the reasonableness of the settlement, that is not a jury issue under the circumstances of this case because the undisputed evidence is that Marshall did not negotiate the settlement amount at all and the *Nunn* Agreement was the result of collusion. *See Sidman*, 841 F.3d at 1205 ("Because substantial evidence supports the

---

[8] *Supra* n.5.

district court's finding that Culbreath agreed to settle the claim for any amount in exchange for [plaintiffs'] agreement not to execute the judgment against it, we affirm on the ground that the settlement agreement was negotiated in bad faith, without the need to consider whether the settlement was reasonable in amount."); *see also Hempel*, 4 F. App'x at 719 ("[C]ourts have found collusion or unreasonableness as a matter of law when the evidence in the record indicated that a factfinder could reach no other conclusion."). *Cf. Nunn*, 244 P.3d at 124 ("[T]he particular amount of the stipulated judgment merely serves as evidence of the value of Nunn's claims as bargained for and does not represent the presumptive value of the actual damages in the bad faith case.").

SGM also argues there is no collusion because SGM and Marshall notified MUSIC of the *Nunn* Agreement negotiations during the September 8 settlement conference and provided MUSIC a draft of the agreement before it was signed. But nothing on the face of the *Nunn* Agreement would have informed MUSIC of the purported negotiations between the parties (if any) over the settlement amount. And while the inflammatory recitals or attorneys' fee amount might appear untoward on their face, the Court is not convinced that mere knowledge of the provisions of the agreement alone necessarily put MUSIC on notice of collusion. *See Sidman*, 841 F.3d at 1204 ("[W]e cannot say that an indemnitor's knowledge of a *Coblentz* agreement's terms will necessarily put it on notice that the agreement arises from fraud or

19

collusion, as the agreement's fraudulent or collusive nature will not always (or even often) be apparent on its face.").

*   *   *

For the reasons shared above, the Court finds the *Nunn* Agreement between SGM and Marshall was the result of collusion as a matter of law.[9] It lacked any negotiation on damages, it included fees not recoverable in the Root Lawsuit, it included negotiated terms designed to affect the insurance coverage or harm MUSIC's interests, and Marshall had meritorious defenses.

Therefore, the Court GRANTS MUSIC's Motion for Summary Judgment (Dkt. 80). It is ORDERED that judgment shall enter in favor of MUSIC and against SGM leaving no genuine issues for trial. It is FURTHER ORDERED that SGM's Motion for Partial Summary Judgment (Dkt. 76) is DENIED.

DATED: September 27, 2025.

BY THE COURT:

S. Kato Crews
United States District Judge

---

[9] Because the Court grants summary judgment in favor of MUSIC and against SGM on MUSIC's collusion affirmative defense, the Court does not reach the other issues raised in the parties' cross motions.